UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| KIM SERRANO and AMANDA REED, | ) | |
|---|---|---|
| Plaintiffs, | ) | |
| v. | ) | CAUSE NO.: 2:12-CV-146-TLS |
| CINEMARK USA, INC., | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

The Plaintiffs, Kim Serrano and Amanda Reed, were both assistant managers for Defendant Cinemark USA, Inc., at its movie theater located in Valparaiso, Indiana. After the Defendant terminated their employment for separate violations of its non-fraternization policy, the Plaintiffs sued under Title VII, claiming that their terminations were unlawful discrimination based on their sex. The Plaintiffs allege that they were disciplined more harshly than male assistant managers who violated the same work place policy that prohibited management level employees from fraternizing with subordinate employees. Reed also asserted a claim under the Equal Pay Act, which is no longer pending.

This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 34], and the supporting brief and exhibits. The Plaintiffs filed a combined brief in response, as well as supporting exhibits. The Defendant filed a reply brief.

**STATEMENT OF FACTS**

The Defendant owns more than 300 movie theaters in the United States, including one in Valparaiso, Indiana. Generally, Cinemark's theaters have assistant managers and senior assistant managers who report to the general manager at that location. The general manager reports to a

regional leader. Susan Westrick was the general manager of the Valparaiso Theater, and she reported to Charly Street, Cinemark's Midwest Regional Leader. Additionally, Kathleen Spina was Cinemark's Senior Human Resources Manager. She reported to Brad Smith, Vice President of Human Resources.

The Defendant uses written Employee Guidelines, which advise employees that the employment relationship is considered "at will." It also identifies certain types of misconduct as "generally requiring immediate termination." This misconduct includes:

> Dating or otherwise socially fraternizing with employees under your supervision, regardless of their age.

> Managers, Assistant Managers, and Assistant Manager Trainees are also strictly prohibited from dating or otherwise socially fraternizing with any Cinemark employee who has not reached the age of 18 whether or not such employee is under their supervision.

(Street Dep. Ex. 2, ECF No. 36-5.)

**A.     Kim Serrano**

In late September 2010, one of the assistant managers at the Valparaiso Theater, Kim Serrano, met with Westrick and informed her that she had been having an affair with Valparaiso Theater employee Kyle Semento. Semento, who worked as an usher, was 18 years old. Serrano was 39 years old. Westrick told Serrano everything would be fine with respect to Serrano's job as long as nothing further happened until Semento officially quit his employment. Semento resigned his employment the next day. On or about October 10, 2010, Deb Good, the mother of one of Semento's friends, came to the Valparaiso Theater looking for Serrano, and complaining that Serrano was dating an employee. When Serrano learned of the incident, she warned

Westrick that Good may contact Westrick. Serrano asked Westrick if she was going to tell Street, and Westrick advised her that it would be better coming from Serrano.

On October 11, 2010, Serrano called Street, and informed him about what was going on in her life, including the relationship with Semento. She advised that Westrick had assured her "everything would be fine." (Serrano Dep. 27.) Serrano informed Street about Good's arrival at the theater, and assured Street that she would get a restraining order if Good came to the theater again. Street told Serrano that he was glad she called him first so he did not hear about her conduct from someone else. He also informed Serrano that he would have to talk to Human Resources.

That same day, Street sent an email to Spina seeking advice about Serrano's conduct. Street informed Spina that Serrano was an extremely good assistant with no prior problems. He indicated that he only wanted to document the incident for her file, but recognized that he had "terminated many for fraternizing in the past." (ECF No. 36-6.) Spina reviewed the situation with Smith, Vice President of Human Resources. After consulting with Human Resources, Street decided to terminate Serrano's employment in light of the non-fraternization policy. Serrano was informed of the decision on October 12, 2010.

**B.     Amanda Reed**

On November 29, 2010, at about 3:00 AM, one of the assistant managers at the Valparaiso Theater, Ryan Sanford, received a text message from another assistant manager, Zach Virgo. The text inquired whether Sanford knew that Amanda Reed was "seeing" floor staff employee Andrew Vendl. Virgo's text to Sanford was prompted by texts Virgo had received

from a floor staff employee Chris Perkins. Perkins claimed that Reed was currently at the apartment Vendl shared with Perkins and a third floor staff employee, Matthew Murga. He further advised that Reed was in Vendl's room and Perkins and Murga could hear heavy breathing. The next day, Sanford spoke to Virgo about the text messages. Sanford then contacted the corporate office to report a possible violation of the non-fraternization policy.

After Reed's alleged conduct was reported to Cinemark's corporate office, Street asked Cinemark's Loss Prevention Manager, David Miller, to conduct an investigation at the Valparaiso Theater. Street informed Miller that there were possible fraternization issues, and he was not sure what the issues were, or who was being truthful.

As part of his investigation, Miller interviewed nine employees and received written statements from eight of them. Over the course of his investigation, the witnesses' versions of the scope of Reed's fraternization changed. Despite making written reports about Reed spending the night in Vendl's room, Perkins and Murga wanted to recant their stories after learning that Reed could be terminated from her employment. They stated that they made the report because they wanted their apartment mate, Vendl, to be fired. Miller reported that Reed admitted spending time at the apartment on three occasions, but denied that any sexual activity took place. She explained that she made the visit that prompted the report so she could tell Vendl, who had a crush on her, that he needed to stop texting her about non-work related matters and that she did not want a relationship with him. She had this discussion in his room so as not to embarrass him in front of his roommates. She stated that they talked all night and that she left in the morning. According to Miller's report, Perkins and Murga did not cooperate with his follow-up efforts to interview them, as they stated they wanted to retract the allegation of sexual activity.

4

Additionally, Murga asked if he needed to hire an attorney, and Perkins stated that his parents advised him not to speak to Miller any further.

Miller did not limit his investigation to questions about Reed's conduct, but also asked other assistant managers about their interactions with floor staff outside of work. Miller ultimately concluded that, at some point, every member of the management at the Valparaiso Theater, excluding Westrick, had engaged in some type of fraternization. He explained that the activity that could be interpreted as fraternization included attending a wedding, watching movies at floor staff members' homes, playing card games together, and occasionally going to lunch.

On March 2, 2011, Miller provided his findings to Street. After reviewing Miller's report and findings and consulting with Human Resources, Street decided to discipline the Valparaiso Theater assistant managers for their violations of the non-fraternization policy. Sanford and Minninger received one-week suspensions. Minninger's write-up indicated that he hung out with three different members of the floor staff. Sanford received his write-up and suspension for going to a hobby store to meet another assistant manager, who brought an employee with him. Virgo was suspended for a longer period, two weeks, because he bought groceries for floor staff, which was considered a gift. Street decided that the appropriate response to Reed's violation was to terminate her employment. He explained that regardless of which version of events was true, Reed had been in Vendl's room that night with the door closed. Later, Street imposed a one-week suspension on another assistant manager, Aaron Fletcher, because he went to Reed's house while a subordinate employee was there and they watched a movie. Christopher Leitz was also an assistant manager at the time of investigation, but was no longer working for the Defendant

5

when Street made his discipline decisions.

## ANALYSIS

The question before this Court on summary judgment in this Title VII case is whether the plaintiffs have "'one way or the other' presented sufficient evidence that [they are] protected by the statute, suffered an adverse employment action, and sufficient evidence exists that a rational jury might conclude the employer acted on account of the plaintiff[s'] protected class as opposed to some other benign reason." *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 514 (7th Cir. 2012). The Plaintiffs satisfy the first two criteria. Concerning the third, the Defendant maintains that it disciplined each assistant manager to match the severity of his or her violation of the non-fraternization policy. The Defendant terminated the Plaintiffs' employment because it considered their violations to be the most egregious, not because of their protected class. The Plaintiffs believe that a jury could find this explanation suspect for a variety of reasons. First, the Plaintiffs argue that the fraternization policy itself does not describe varying degrees of violations. They argue that the "evidence gives rise to an inference that all violations of the policy are dischargeable offenses with no flexibility or wiggle room for other penalties." The Plaintiffs assert that this "inference would defeat Defendant's argument that they fired Plaintiffs because their violations of the fraternization policy were more severe than their male counterparts." (Pls.' Combined Summ. J. Resp. 13–14, ECF No. 38.)[1]

---

[1] Actually, a finding that the Defendant exercised discretion even though the policy did not allow for it would not necessarily defeat the argument that the Defendant relied on the varying degrees of severity to determine consequences. It would mean that the Defendant did not follow its own policy. The reason it did not follow the policy could be the exact reason the Defendant has offered. In any event, as will be discussed within this Opinion, the evidence does not give rise to an inference that all violations of the policy were dischargeable offenses with no flexibility to impose other penalties.

6

The Plaintiffs argue that they have shown that "every assistant manager known to have violated the fraternization policy was granted leniency, while every female assistant manager know to have violated the same policy (Serrano and Reed) was fired." (Pls.' Combined Summ. J. Resp. 20.) They submit that the systematically better treatment of the male employees is sufficient to defeat summary judgment. Street explained the differing treatment in his deposition:

> Q. Is it fair to say that of all the employees at the Valparaiso location of Cinemark who were assistant managers and who violated the fraternization policy on one or more occasions only the females were fired?
> A. Due to circumstances, yes. Had the shoe been on the other foot, if they had gone over and played card games or had gone to church, they wouldn't have been terminated. They would have got the suspensions and write-ups that the others did.

(Street Dep. 61, ECF No. 36-4.) Serrano argues that the Defendant cannot plausibly assert that her violation was severe because her relationship did not create any favoritism or retaliation for which the policy was intended to avoid. She also points to the Defendant's failure to terminate the employment of an assistant manager at another theater who was known to be dating a subordinate female employee as an inconsistent application of the policy. Reed counters that her offense was not actually more severe than that of two other assistant managers, Leitz and Minninger. She also claims that the Defendant refused to investigate violations by male assistant managers.

In light of the parties' arguments, it makes sense to proceed directly to an analysis of whether the Defendant's proffered non-discriminatory reasons for firing the Plaintiffs were pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013). For if there is no evidence of pretext, then the Defendant's non-discriminatory justification must be believed, "which necessarily precludes liability under Title VII." *Id.* at 738; *see also Scruggs v. Garst Seed*

*Co.*, 587 F.3d 832, 838 (7th Cir. 2009 ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action."). This is also the approach the Plaintiffs advocate with respect to the indirect method of proof. Additionally, the Plaintiffs assert that their claims survive summary judgment under the direct method. In arguing that they have a convincing mosaic of circumstantial evidence, however, they rely on the same essential argument—that the Defendant gave systematically more lenient treatment to male employees who violated the non-fraternization policy. Thus, the Court's inquiry, whether under the direct or indirect method—and even when analyzing pretext—is the same. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 313 (7th Cir. 2012) (stating that the two distinct methodologies are no longer necessary and it would be better to collapse the tests "into a single, unified approach that distills the core issue at the heart of these cases: whether 'a rational jury could conclude that the employer took that adverse action on account of the employee's protected class . . . , not for any non-invidious reason'") (brackets omitted) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)).

The Defendant has offered the differing severity of the assistant managers' conduct as a non-discriminatory reason why it did not impose equal discipline for all the fraternization violations that were occurring among the employees at its Valparaiso theater. To show that this reason is pretextual, the Plaintiffs "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that [the Defendant] did not act for the asserted non-discriminatory reasons." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007). If the Defendant

8

honestly believed the reasons it gave, the Plaintiffs' efforts to show pretext fail, regardless of whether that reason was "foolish, trivial or baseless." *Id.*; *see also Scruggs*, 587 F.3d at 839 ("If the employer honestly believed the reason it proffers for its employment decision, the reason was not pretextual."); *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 417 (7th Cir. 2006) ("[T]he question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action.").

### A.     The Non-Fraternization Policy

The Plaintiffs argue that a jury should decide whether the Defendant's fraternization policy is inflexible and requires discharge for all violations, or whether it has the type of flexibility Street relied on when imposing varying degrees of discipline. The non-fraternization policy issued in the Defendant's Employee Guidelines did not delineate any degrees of violations or distinguish between types of fraternization. However, neither did it require termination for every offense. The policy indicated that the Defendant viewed some acts of misconduct "as *generally* requiring immediate termination," including "[d]ating or otherwise socially fraternizing with employees under your supervision." (ECF No. 36-5 (emphasis added).) The Plaintiffs introduce a different employee fraternization policy, and argue that it is genuinely disputed whether it applied to all of the assistant managers instead. The policy the Plaintiff's submit is one that Reed signed when she worked in a separate theater, Cinemark-Bourbonnais. Under that policy, dating or otherwise socially fraternizing with employees under a manager's supervision "will result in immediate termination." (Ex. 3 to Miller Dep., ECF No. 39-3.)

9

The Plaintiffs have no evidence that this policy replaced the policy contained within the Employee Guidelines for employees working outside the Bourbonnais location. Street explained that the policy Reed signed while working at Cinemark-Bourbonnais was not issued company wide. Rather, it was a manager's response to a specific situation at her theater. Accordingly, the Plaintiffs cannot rely on this policy to create a genuine issue of material fact with respect to the non-fraternization policy in effect at the time of the lawsuit's events.

That absence of degrees of severity in the text of the non-fraternization policy does not create an inference that Street, as the disciplining supervisor, was barred from considering varying degrees of severity. Street readily recognized that the policy did not delineate any degrees of violation, but testified that a fraternization violation was one "that generally requir[ed] termination which means to me that there are some degrees." (Street Dep. 19, ECF No. 39-4.) Street understood the non-fraternization policy to require discharge only in cases involving a dating or sexual relationship between a manager and a floor staff worker. For other violations, the appropriate response might be a written warning, suspension, or discharge. (Street Dep. 16–17.) There is no evidence to suggest that Street did not honestly believe that Cinemark's prohibition on fraternization contemplated degrees of severity, or that allowing for differing discipline to correspond to the perceived severity of the conduct was not an effective management tool or business practice—an otherwise plausible explanation. "[W]hen an employer articulates a plausible, legal reason for [its action], it is not [the court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for [its action]." *Silverman v. Bd. of Educ.*, 637 F.3d 729, 738 (7th Cir. 2011) (internal quotation marks omitted).

The Court does not agree with the Plaintiff's statement that "only a jury can sort out the fact issue of whether Defendant's fraternization policy is inflexible and requires discharge for all violations or whether it has some flexibility." (Pls.' Combined Summ. J. Resp. 4.) This is not the type of fact for a jury to consider. The Defendant obviously believed the policy allowed for discretion on the part of the disciplining supervisor, and did not demand termination for every offense, as evidenced by the fact that some violators received a write-up and suspension, and other were discharged from their employment. For a jury to interpret the Defendant's policy as demanding immediate termination for any level of fraternization (which in this case would have necessitated terminating every one of the assistant managers at the Valparaiso Theater) would be contrary to the evidence. Thus, there is no genuine issue on whether the policy allowed for flexibility. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating that a dispute about a material fact is genuine if the evidence is such that a reasonably jury could return a verdict for the nonmoving party).

The relevant issue that remains is whether Street, in exercising his discretion, fired the Plaintiffs because he believed that their violations of the fraternization policy were more severe than the violations committed by the other assistant managers or, instead, whether the differential treatment was based on the gender of the violators. As stated above, before this issue can reach a jury, there must be some evidence in the record from which it can be inferred that Street was lying about the reason he treated the Plaintiffs' violations more harshly. A plaintiff cannot establish pretext merely by showing that the defendant's decision to terminate her was "'mistaken'" or "'ill considered.'" *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005) (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

**B.     Serrano's Pretext Arguments**

In support of her discrimination claim, Serrano identifies Chris Fodness, an assistant manager at the Defendant's Mishawaka location, as a similarly situated employee who should have received the same discipline she received. According to an assistant manager who worked at the Mishawaka location, it was "common knowledge" at that theater that Fodness was dating and romantically involved with a female staff employee. (Decl. of Matthew Yandl, ¶ 8, ECF No. 39-2.) The Plaintiff does not put a time frame on this evidence, but Yandl worked at the Mishawaka Theater from 2000 to May 2007. Thus, this fraternization occurred at least three years before the events being considered in this litigation. Missing from the record is any evidence that Street had knowledge of this relationship. Fodness worked at a different theater and was supervised by a different general manager. As Yandl explains it, the general manager at that theater simply told Fodness that either he or his girlfriend would have to quit. Fodness terminated his employment relationship with the Defendant before Serrano even began working at the Valparaiso theater. The discipline Fodness did, or did not, receive is not evidence of discrimination or pretext without proof that Street, the decisionmaker, knew about his violation and then treated Fodness more favorably than he treated Serrano. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) (finding that the plaintiff's purported comparators were not similarly situated "because they were not subject to the same decisionmaker as [the plaintiff] when they purportedly violated the policy"); *Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004) (holding that the discipline other employees may, or may not, have received did not shed any light on the decision to discharge the plaintiff absent evidence that any of them were disciplined by the same decisionmaker).

Serrano also challenges whether her behavior can legitimately be considered "severe," arguing that it did not "create the havoc that the rule was designed to prevent." (Pls.' Combined Sum. J. Resp. 18.) But pretext requires a showing that the Defendant did not honestly consider the conduct severe, and it is not outside the realm of plausibility to consider a manager's sexual affair with a subordinate employee a severe violation of a non-fraternization policy. That Serrano's conduct had a higher risk of potentially creating such problems supports the Defendant's characterization of her conduct and the decision to terminate her employment. As the Defendant notes, it was not required to wait until the workplace was disrupted by favoritism, retaliation, or in some other way to enforce a policy aimed at preventing such disruption. In any event, Serrano's argument downplays the impact of her actions. A concerned mother, Deb Good, came to the theater to complain that Serrano was dating an employee. Serrano reported Good's complaint to Westrick, and indicated to Street that she might seek a restraining order to keep the mother away. Serrano's husband also contacted the theater by email to complain of the relationship. Serrano's argument regarding whether the Defendant could legitimately consider her conduct a severe policy violation amounts to second guessing an employer's decision, not establishing that it was a phony reason. *See Coleman*, 667 F.3d at 852 (we do not ask in Title VII cases whether the reason for firing was "inaccurate or unfair," or whether the employer "may be too hard on its employee").

As evidence that she was treated differently from her male counterparts, Serrano asserts that she was the only employee required to report her fraternization to corporate. Serrano testified that when she informed Westrick that Good had come to the theater to complain about her relationship with Semento, she asked Westrick whether she intended to report the complaint

13

to Street, and Westrick told her maybe she should talk to Street instead. Serrano took the advice. It is unclear what Serrano believes a jury would infer from these events. There is no reason to believe that the matter would not have been reported to Street one way or another after Good came to the theater. Serrano argues that the male employees were not required to report their fraternization to corporate, but there was no similar factual scenario that played out with regard to the male employees. Instead, the male employees were required, as part of a formal investigation, to provide statements and answer questions, all of which were then reported to corporate. The distinction Serrano attempts to make is one without any clear relevance or import.

Serrano's designated evidence simply does not discredit the reason offered by the Defendant for its decision to terminate her employment after it learned that she had been having a sexual relationship with a subordinate employee in violation of its non-fraternization policy. "[W]hen uneven discipline is the basis for a claim of discrimination, the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011). Serrano's misconduct was not similar to the other violations known to the disciplining supervisor. Because "a reasonable fact finder would be compelled to believe the [Defendant's] explanation" that Serrano's misconduct warranted more than the suspension issued for the non-sexual fraternization violations that were discovered by Miller's investigation, the Defendant is "entitled to summary judgment." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).

**C.      Reed's Pretext Arguments**

Reed submits that a jury should determine whether the violations committed by her and the male assistant managers were comparable. Reed asserts that she was similarly situated to both Leitz and Minninger, and that the Defendant's treatment of these male assistant managers is evidence of discrimination. She also points to Fodness as an appropriate comparator. To allow the claim to proceed to a jury, there must be evidence from which a jury could conclude that the Defendant is lying about its reasons for believing the conduct of the male and female assistant managers was not comparable.

When Leitz was assistant manager at the Valparaiso theater, a close personal friend of his, Brandon McAfee, was hired as an employee in the usher department. Before he was hired, Leitz made Westrick aware that McAfee was a friend who attended the same university. Leitz continued to socialize with McAfee outside of work after he was hired. McAfee was even a groomsman at Leitz's wedding. The conduct Reed points to as similar to her own is that Leitz shared an apartment with McAfee for a one to two week period.

Reed's reliance of Leitz as a comparator is not helpful. Street was not aware that Leitz had shared an apartment with McAfee before Miller's investigation.[2] And after Miller sent his investigation report to Street in March 2011, the Defendant had no opportunity to conduct any further investigation or make any discipline decisions related to Leitz, as his employment with the Defendant ended several months earlier, in December 2010. Thus, the evidence concerning Leitz cannot be used to cast doubt on Street's motive.

Reed also points to Minninger as an appropriate comparator. Minninger's November

---

[2] Even after the investigation, Miller did not report that Lietz lived with McAfee. Miller included Minninger's written statement in which he writes that it was rumored that Lietz stayed with McAfee over the winter break from Valparaiso University until he was allowed back in his dorm room.

2008 performance evaluation from Westrick and Street included an instruction to keep his "distance from the employees to not have it look like you are friends." (Minninger Dep., Ex. 16, ECF No. 39-9.) Reed does not propose that this warning is related to conduct that would have suggested Minninger was dating a subordinate employee, or that he created potential appearance of a sexual relationship. Reed's argument is that Minninger engaged in the same type of conduct for which she was terminated when he was behind closed doors with Kyle Semento. But there is no evidence in the record that Street was aware of these potentially comparable actions, nor is there any time frame put to the claims. Street cannot be faulted for failing to respond to activity of which he was not informed. To satisfy the knowledge requirement, Reed may intend to rely on Semento's statement that the "behavior of Minninger was well known to Cinemark management, because we did not keep our relationship a secret." (Decl. of Kyle Semento ¶ 9, ECF No. 39-1.) This statement lumps together all of Minninger's non-work contact with Semento and fails to identify any specific member of management. It is too vague to support an inference that Street, a regional leader who did not work at the theater, knew Minninger and Semento spent time together outside of work, much less in the same room. Reed attempts to rely on Virgo's testimony that he reported Minninger to Westrick for socially fraternizing with subordinate employees, but Virgo did not say that he reported a dating or sexual relationship. Leitz testified that he saw Minninger rubbing or touching female employees once or twice, but he could not recall whether he reported this to Westrick or Miller.

Reed also claims that she is similarly situated to Fodness, who was dating a subordinate employee. For the reasons stated above, he is not an appropriate comparator: he worked at a different theater; Street was not aware of his relationship; and Fodness terminated his

employment before Reed even began her employment.

None of the other male assistant supervisors identified by Reed were reported to management for being behind closed doors at a private residence with a subordinate employee of the opposite sex. After a thorough investigation into the non-fraternization policy violations of the Valparaiso Theater assistant managers, the Defendant determined that Reed's conduct stood out as more severe. Miller's investigation revealed that she was the only assistant manager reported to have spent late evening/early morning hours in an employee's bedroom. Reed argues that no sexual activity took place, and that the reporting employees recanted their initial report of "sexual noises" coming from the room. Faced with the evidence, however, a jury would be unable to find that the Defendant was not entitled to consider the conduct a severe violation of its policy. Even if no sexual relations actually took place, the conduct created the appearance of a sexual relationship with a subordinate, and created a situation that prompted a report to be made. "[I]n assessing a plaintiff's claim that an employer's explanation is pretextual, [the Court does] not sit as a super personnel review board that second-guesses an employer's facially legitimate business decisions." *Argyropoulos*, 539 F.3d at 736 (internal quotation marks omitted). Here, the Plaintiffs' disagreement with their employer's decision are an invitation to second guess just such a decision.

### D.     Investigation

The Plaintiffs also assert that it is a significant act of unlawful disparate treatment that the Defendant refused to investigate policy violations committed by males. They argue that Miller's report is filled with instances where the male assistant managers, such as Leitz, Minninger,

17

Virgo, and Sanford, violated the non-fraternization policy on multiple occasions, but that the Defendant did not then "send Miller or anyone else to investigate, but gave the males a free pass." (Pls.' Combined Summ. J. Resp. 14.) The Court does not find that the evidence supports this characterization. The Defendant had no reason to investigate until an employee reported a potential violation to the corporate level, and there is no evidence that reports were made about the Valparaiso Theater before the report involving Reed. Then, when Miller investigated, he asked the employees about their violations and concluded that each of them had fraternized with subordinate employees in some manner. He set out the kinds of violations, such as watching movies, playing cards, and going to lunch together. It was by Virgo's own admission that Miller reported that Virgo visited the same apartment that Reed did and played cards and once supplied the young men who lived there with a few groceries because they were broke. Thus, it is not clear what additional investigation the Plaintiffs believe the Defendant should have conducted. Additionally, for these violations, the male employees were not given a "free pass," but were written up and suspended. For example, Virgo's actions resulted in a two-week unpaid suspension.

The Plaintiffs' views on the fraternization violations differ from the Defendant's, but the Defendant was entitled to its own view, as long as it was not based on an impermissible basis, such as gender. The Plaintiffs' evidence, whether considered through the direct method of proof or the indirect method, does not raise a reasonable inference that it was.

## CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment [ECF No. 34] is GRANTED. The Clerk will enter judgment in favor of the Defendant and against the Plaintiffs.

SO ORDERED on March 25, 2015.

                                                  s/ Theresa L. Springmann
                                                  THERESA L. SPRINGMANN
                                                  UNITED STATES DISTRICT COURT
                                                  FORT WAYNE DIVISION